## Johnston Fife Hat Company v. The National Bank of Guthrie.

1. DAMAGES—*Petition for, States Facts Sufficient, When—Error.* A petition for damages against a bank which alleges that Melone Bros. were engaged in the mercantile business in the City of Guthrie; that the National Bank of Guthrie was a corporation engaged in the general banking business; that DeSteiguer was the president of the bank, and had active control and management of its business; that the Johnston Fife Hat company was a corporation under the laws of Missouri, doing a general merchandise business; that Melone Bros. entered into a conspiracy with DeSteiguer, and through him with the bank, whereby Melone Bros. were to purchase of wholesale dealers goods to the amount of several thousand dollars on credit, and have them shipped to their Guthrie store; that the bank was to loan them $1.000. and take a chattel mortgage on the stock for a large sum; then sell the goods under the mortgage, and give the bank one-third the proceeds and the Melone Bros. two-thirds, and leave the creditors unpaid; that pursuant to this conspiracy they bought goods of plaintiff in the sum of $354, and goods from divers other firms to the value of over $10,000; that the bank loaned them $1,000. and took a chattel mortgage on the stock for $9,960, and before the bills for goods became due, foreclosed the mortgage and took possession of goods and sold same for $5,800, which the bank received; that the plaintiff sold the goods in good faith with no knowledge of the conspiracy to defraud.

and which seeks to recover the value of the goods sold, states a good cause of action against the bank, and it was error to sustain a demurrer to such petition.

2. BANKING CORPORATIONS—*Liable for Damages, When.* It is a part of the duty of a banking corporation to loan money, and to collect such loans by sale of goods or other security, and where the president of the bank has the active control and management of the affairs of the bank, and in conducting its business enters into a conspiracy to defraud, and puts the same into execution whereby another is damaged, the bank will be liable in tort for the damages.

3. SAME—*Liable for Acts of Officers.* A managing officer of a bank is not a servant of the corporation, but is the head of the corporation, who does its thinking and through him it acts. And the bank is liable for his torts committed in carrying on its business while acting in the scope of his powers, even though the tortious acts are not within the corporate powers of the bank.

4. SAME—*Guilty of Fraud.* A corporation may be guilty of a fraud. As a mere legal entity it can have no will, and cannot act at all, but in its relations to others, it is represented by its officers and agents, and their fraud in the course of the corporate dealings is, in law, the fraud of the corporation.

5. SAME—*Responsible for Wrongs.* Corporations are responsible for the wrongs committed by them, under subsantially the same rules which govern the responsibility of natural persons.

6. SAME—*Fraud.* If an officer of a banking corporation, while exercising the authority conferred on him by the corporation, is guilty of falsehood and fraud, the corporation is liable for the consequence which may flow therefrom.

7. SAME—*Notice of Fraud.* Where the president of a banking corporation, who has the control and management of its business, enters into conspiracy to defraud third persons, and carries out such fraudulent design through his relations with the bank, such corporation has notice of such fraud, and if it accepts the benefits resulting therefrom it becomes a participant in the fraud and liable for the damage.

*Error from the District Court of Logan County.*

*Keaton & Cotteral,* for plaintiff in error.

*E. B. Green* and *Harper S. Cunningham,* for defendant in error.

The opinion of the court was delivered by

BURFORD, J.:    This is an appeal from a judgment sustaining a demurrer to plaintiff's complaint. The plain-

tiffs brought their action in the district court of Logan county to recover judgment against the defendant, together with certain other defendants, in which complaint they alleged that the defendants had entered into a conspiracy by which the plaintiffs were defrauded in the sale of certain merchandise. The complaint is as follows:

"In the District Court of the First Judicial District, holding terms at Guthrie, in and for Logan County, Territory of Oklahoma.

"Johnston Fife Hat Company, a corporation under the laws of Missouri, Plaintiff, v. Drury L. Melone and Baker H. Melone, partners composing the firm of Melone Brothers, and L. DeSteiguer, and the National Bank of Guthrie, Defendants.

"Come now the Johnston Fife Hat Company, a corporation doing business under the laws of Missouri, and for their complaint against the defendants say:

"That at all times hereinafter mentioned the said Drury L. Melone and Baker H. Melone were partners, composing the firm of Melone Brothers, and engaged in the retail clothing and gent's furnishing goods business in the city of Guthrie, Logan county, Oklahoma Territory.

"That the said defendant, the National Bank of Guthrie, was at such times, and now is, a national banking corporation, organized and doing business under the national banking laws of the United States. That L. DeSteiguer was and is the president and business manager and active officer of said National Bank of Guthrie.

"That the plaintiffs, Johnston Fife Hat company, above mentioned, are a corporation, engaged in the wholesale clothing and gent's furnishing goods, etc., business in the city of St. Joseph, Mo.

"That on or about the 30th day of October, 1891, the said defendants, Melone Brothers, and the said National

Bank of Guthrie, through its agent and business manager, L. DeSteiguer, for the use and benefit of said bank, while acting in the due course of his business and scope of his authority as such agent and officer of said bank in loaning money and taking mortgages for said bank, which was to take chattel mortgages on personal property to secure loans by said bank to others, and L. DeSteiguer, all entered into a fraudulent and corrupt conspiracy and agreement, whereby it was understood and agreed between said defendants that the Melone Brothers should procure by and with the advice and assistance and aid and help of said other defendants, and purchase from various wholesale houses in St. Joseph, Kansas City, Chicago, and elsewhere, and of these plaintiffs, all of the goods and merchandise that the said Melone Brothers could purchase and in the sum of many thousand dollars' worth on credit and with the intention and purpose of never paying for the same.

"That they should procure these plaintiffs and other wholesale houses to ship these goods to the said Melone Brothers at Guthrie. That thereafter the said Melone Brothers should give to the said National Bank of Guthrie, in the name of L. DeSteiguer, president, a chattel mortgage on said goods for a large sum of money, to-wit, the sum of $10,000, or thereabouts, without the said National Bank of Guthrie paying to the said Melone Brothers any sum whatever therefor, excepting the sum of about $1,000 or $1,500 loaned by the bank to said Melone Brothers, and without the said National Bank of Guthrie actually being a creditor of said Melone Brothers in any sum whatever, except as above stated, and that said defendants should then pretend to foreclose said mortgage and take all of the goods purchased from said creditors, and divide the proceeds thereof, the said Melone Brothers giving the said National Bank of Guthrie and L. DeSteiguer the one-third of the amount which said stock of goods of said Melone Brothers should be worth or bring.

"The plaintiffs allege that in pursuance to said fraudulent and corrupt conspiracy and agreement the said

defendants by and through one of the said defendants. Baker H. Melone, did come to the city of St. Joseph, Mo., and purchase of these plaintiffs goods, wares and merchandise in the sum and value of three hundred and fifty-four dollars and fifty cents, a true and verified account of which is hereto attached and marked exhibit 'A' and made a part of this complaint.

"The plaintiffs allege that the said National Bank of Guthrie, through its agent and president, L. DeSteiguer, in the due course of his employment, and as recognized by the directors of said bank in his general authority as given by said directors of said bank to do any and all acts for said bank, and L. DeSteiguer, furnished to the said Baker H. Melone on said trip $100 to pay expenses of said trip, and that said purchases were made in pursuance to said agreement, and by the request, aid and assistance of all of the said defendants.

"The plaintiffs further allege that after the receipt of said goods of the plaintiffs by said defendants, the said National Bank of Guthrie, in the name of L. DeSteiguer, president, did, in pursuance to said agreement and conspiracy, take a chattel mortgage on said goods and the said other goods of the said Melone Brothers in the sum of $9,960, which said mortgage was without any consideration whatever, excepting the sum of about $1,000 or $1,500, the money of said bank loaned to said Melone Brothers, and was fraudulent and corrupt and a part of the carrying out of the said agreement and corrupt conspiracy and was made in pursuance thereof.

"That the said L. DeSteiguer and the National Bank of Guthrie, through and by its said officer and agent, L. DeSteiguer, who was authorized to take and foreclose chattel mortgages for said bank, did proceed to foreclose said chattel mortgage and did take and close up the business of the said Melone Brothers, and did convert the said goods and merchandise and property of the said Melone Brothers to the use and benefit of said bank and L. De-Steiguer.

"That the said bank, by its said president, foreclosed said mortgage and sold said stock of goods, and received

a check for the sum of $5,300 therefor, and afterwards took a note for $5,300, concerning the same transaction, which note said bank, by its directors, officers and agents, have affirmed with full knowledge of all facts herein.

"Plaintiffs further allege that the said goods of the said plaintiffs in the sum of $354.50 were purchased of these plaintiffs by the said Melone Brothers, with the aid, consent, and assistance of all of the said other defendants and in pursuance of the said fraudulent and corrupt conspiracy, to cheat and defraud these plaintiffs, and with the intention of never paying for these goods, and with the intention and purpose and agreement that all of said defendants should divide the proceeds among themselves.

"Plaintiffs allege that these goods have never been paid for, and that these defendants are now indebted to these plaintiffs for the same, and the said amount is now due.

"Plaintiffs allege that they had never received any knowlege or notice of the said agreement and conspiracy of the said defendants, but sold the said goods to the said Melone Brothers in the usual course of business, believing the said Melone Brothers to be solvent and that they intended to pay therefor, and that the said Melone Brothers intended to continue in business.

"The plaintiffs further allege that the said bill of goods and merchandise stated in exhibit 'A' hereto attached was sold to said defendants, Melone Brothers, upon credit, and that it is the custom among wholesale merchants generally, and the custom in the business of the plaintiffs that all accounts for goods sold and delivered on credit to become due and payable whether the term of credit had expired or not, when any suit or action at law is brought against, or any lien is given by the purchaser, or when the purchaser suspends payment or is closing out. That the said defendants, Melone Brothers, knew of said custom and regulation in the business of the plaintiffs at the time they purchased said goods, and the credit to said Melone Brothers on said account was given in accordance with said custom and conditions and said

Melone Brothers at the time agreed thereto and that the said conditions were a part of the credit given said Melone Brothers.

"Plaintiffs allege that said Melone Brothers assigned and sold out and went out of business and ceased to carry on said business on the 23d day of November, 1891, and that they suspended payment on their bills and accounts at the time and prior thereto, and that suits and actions at law were brought against said Melone Brothers on the 28th day of November, 1891.

"Wherefore, plaintiffs pray judgment against all of said defendants in the sum of $354.50, together with the legal rate of interest thereon, and with the costs of said suit, and for all other proper relief.

"BIERER & COTTERAL,
"Attorneys for Johnston Fife Hat Co."

To this complaint was attached as exhibits an itemized statement of the account, the whole being verified by the affidavit of plaintiffs' agent. To this complaint the defendants, Louis De Steiguer, and the National Bank of Guthrie, each demurred, upon the ground that the same did not state facts sufficient to constitute a cause of action against either of them. The court sustained the demurrer, and the plaintiffs declining to plead further, judgment was rendered in favor of the defendants.

The only question presented is as to the sufficiency of the complaint to constitute a cause of action against the defendant, the National Bank of Guthrie.

The action is one *ex delicto* to recover damages for a tort alleged to have been committed by a national banking corporation, acting by and through its president and general agent.

It is contended by counsel for the bank that the president of the bank had no authority, either in law or fact, to do the acts alleged to have been done by him for the bank, and that his acts were not the acts of the bank as

a corporation for which it is in any form of action liable, and in support of this contention, it is argued that a national bank has no authority to purchase merchandise; to engage in the mercantile business, or to assist others in the purchase of such goods, and hence, if the president of the bank entered into any conspiracy to aid the Melone Brothers in defrauding plaintiffs as alleged in the complaint, that he was then acting without the scope of his authority as an officer of the bank and outside its chartered powers, and hence, the bank is not liable for such actions on his part. This is an adroit evasion of the effect of the allegations of the complaint.

It is conceded by counsel for the bank, "that for acts done by the agents of a corporation, either *ex contractu* or *ex delicto*, in the course of its business and of their employment, the corporation is responsible as an individual is responsible under similar circumstances." Applying this rule to the allegations of the complaint, we think it states a good cause of action against the bank. It is within the power of the bank to loan money, to take mortgages on chattels as security for such loans; to foreclose its mortgages and to sell the mortgaged chattels to pay its lien. It is within the employment of the president of the bank, who has the active management of its business, to make loans for the bank; to take security for it, and to take any necessary steps for the protection of its funds loaned or on hand, and in carrying out any of these functions, the bank is bound by his acts. If in performing any of the duties incident to such employment, he perpetrates a fraud or commits a tort, the bank is liable for such acts.

Applying these observations to the facts alleged in the complaint, it becomes apparent that a good cause of action is set up.

It is alleged in substance that Melone Brothers were engaged in the mercantile business; that they entered into an agreement with the president of the bank that they should purchase a large stock of goods on credit amounting to several thousand dollars; that the bank would loan them about one thousand dollars, and after the stock arrived, which was to be purchased under this agreement, and before the bills for same became due, that Melone Brothers should execute a chattel mortgage to the bank for $10,000; that the bank would foreclose the mortgage, sell the stock and divide the proceeds with Melone Brothers, and leave the creditors unpaid. In pursuance of this agreement, it is alleged, that Melone Brothers purchased the goods in question from plaintiffs; that they made other purchases in pursuance of the conspiracy; that the bank loaned them from $1,000 to $1,500; that the chattel mortgage was executed, the goods taken by the bank and sold for $5,300, which the bank received, or took a note for. This amounted to a conspiracy to defraud plaintiffs, and it was not necessary, in order to render the bank liable in tort, that it should have authority to take each particular step required to consummate the fraud. It is sufficient to charge the bank that it took part in the conspiracy, knowing its purpose. This it did by taking the mortgage; by seizing and selling the goods; by appropriating the proceeds and thus aiding in the fraudulent design and purpose.

When one joins an unlawful conspiracy after it has been formed, at any period, and in the least degree acts in concert or collusion with the conspirators, their acts become his by adoption and the acts of one the act of all. (4 Am. and Eng. Enc. Law, p. 622, and cases cited.)

We have thus far treated this case upon the theory of the law as presented by counsel for the defendant. By

the weight of modern authority this rule has been extended and made to embrace a larger number and different class of cases than was originally within its scope.

In the *National Bank v. Graham*, 100 U. S. 699, Mr. Justice Swayne, in speaking of the liability of corporations for torts, said:

"Corporations are liable f r every wrong they commit, and in such cases the doctrine of *ultra vires* has no application. They are also liable for the acts of their servants while such servants are engaged in the business of their principal, in the same manner and to the same extent that individuals are liable under like circumstances. (*Merchants' Bank v. State Bank*, 10 Wall. 604.) An action may be maintained against a corporation for its malicious or negligent torts, however foreign they may be to the object of its creation or beyond its granted powers. It may be sued for assault and battery, for fraud and deceit, for false imprisonment, for malicious prosecution, for nuisance, and for libel. In certain cases it may be indicted for misfeasance or nonfeasance touching duties imposed upon in which the public are interested. Its offenses may be such as will forfeit its existance."

The court of appeals of New York in the case of *Craigie v. Hadley, Receiver*, 1 N. E. 537, in discussing the extent to which a corporation may be held liable for the fraud of its officers or agents, said:

"A corporation may be, in a legal sense, guilty of a fraud. As a merely legal entity it can have no will, and can not act at all, but in its relation to the public it is represented by its officers and agents, and their fraud, in the course of the corporate dealings, is in law, the fraud of the corporations. There is more difficulty in establishing a fraud against a corporation than against an individual. This arises from the difficulty, in many cases, of determining whether the fraud charged is imputable to the corporation. There may be knowledge of a fact

by an agent of a corporation which, if brought home to the corporation itself, would create responsibility in a given case, but as to which notice will not be imputed to the corporation merely from the fact that it was known by the agent. We need not enter into the distinctions upon this subject. But the general rule is well established that notice to an agent of a bank, or other corporation intrusted with the management of its business, or of a particular branch of its business, is notice to the corporation, in transactions conducted by such agent, acting for the corporation, within the scope of his authority, whether the knowledge of such agent was acquired in the course of the particular dealing, or on some prior occasion."

In *Western News Co.,* v. *Wilmarth,* 6 Pac. 786, the supreme court of Kansas states the rule as laid down by Judge Cooley:

"It is contended that the trial court erred in overruling the demurrer to the petition, for the reason that 'corporations are not liable for torts where the ground of legal responsibility is evil motive.' The law is otherwise. 'Corporations are responsible for the wrongs committed or authorized by them, under substantially the same rules which govern the responsibility of natural persons. It was formerly supposed that those torts which involve the element of evil intent, such as batteries, libels, and the like, could not be committed by corporations. Inasmuch as the state, in granting rights for lawful purposes, had conferred no power to commit unlawful acts, such torts committed by corporate agents must consequently be *ultra vires,* and the individual wrongs of the agents themselves; but this idea no longer obtains.' (Cooley, Torts, 119.")

The supreme court of North Carolina adopts the same rule in *Peebles v. Patapsco Guano Co.,* 77 N. C. 233:

"There is no reason that occurs to us why a different rule should be applicable to cases of deceit from what applies to other torts. A corporation can only act through

its agents, and must be responsible for their acts. It is of the greatest public importance that it should be so If a manufacturing and trading corporation is not responsible for the false and fraudulent representations of its agents, those who deal with it will be practically without redress and the corporation can commit fraud with impunity."

In the case of *Fogg et al v. Griffin et al.* 2 Allen, 1, the supreme court of Massachusetts discusses this question at some length, and well states the rule which is applicable to the case at bar. Chief Justice Bigelow says:

"If it be true, as urged by the counsel for the plaintiffs, that he could not bind the corporation by any false and fraudulent representations, because it had no authority to appoint an agent for an unlawful purpose or to use unlawful means, it would follow that no corporation could be held liable for any acts of its authorized agents, however fraudulent or wicked their conduct might be, or however great might be the injury thereby occasioned to third persons. Such a doctrine finds no support in the law. A corporation can act only through agents. If they, while exercising the authority conferred on them, are guilty of falsehood and fraud, their principal is liable for the consequences which may flow therefrom. The true test of the liability of the principal in such cases is to ascertain whether, in committing a fraud, the agent was acting in the business of his principal. If he was engaged in the course of his employment, then parties injured by his misconduct or fraud can resort for redress to the persons who clothed him with the power to act in their behalf, and who have received the benefits resulting from his agency. (*Foster v. Essex Bank*, 17 Mass. 479, 509.")

In the case of *Goodspeed v. East Haddam Bank*, 22 Conn. 530, the relations of officers of a bank to the corporation is very ably discussed and a marked distinction drawn between the acts of a servant and that of a manager, and the observations of that court are fittingly

applicable to the relations of DeSteiguer to the defendant corporation in this case. We quote at some length from the opinion in that case by Mr. Chief Justice Church:

"The doctrine that principals are not responsible for the wilful misconduct of their agents, as seems to have been sanctioned in the case of *McManus v. Crickett*, 1 East. 106; *Wright v. Wilcox*, 19 Wend. 343, 32 Am. Dec. 507; *Vanberbilt v. Richmond T. Co.*, 2 N. Y. 470, 51 Am. Dec. 315; but denied by Chief Justice Reeve, in his Domestic Relations, 357, we think has never been applied to such a case as this, but only to the acts of agents or servants properly so called; or such an act under instructions and a delegated authority—persons whose duty it is to obey, not to control—as attorneys, cashiers, or others employed by the corporation. The president and directors of a bank, instead of being mere servants, are really the controlling power of the corporation—the representatives—standing and acting in the place of the interested parties. Indeed, they are the mind and soul of the body politic and corporate, and constitute its thinking and acting capacity. In the case of *Burrill v. the Nahant Bank*, 2 Met. 163, 35 Am. Dec. 395, Shaw, C. J., expresses and defines the true rule of appreciating the character and powers of bank directors. He says: 'We think the exception takes much too limited and strict a view of the powers of bank directors. A board of directors is a body recognized by law. By the laws of these corporations, and by the usage, so general and uniform as to be regarded as a part of the law of the land, they have the general superintendence and active management of all the concerns of the bank, and constitute, to all purposes of dealing with others, the corporation. We think they do not exercise a delegated authority in the sense to which the rule applies to agents and attorneys.' The same principle is very distinctly recognized in the cases of *Bank Commissioners v. Bank of Buffalo*, 6 Page, 502; *Life and Fire Ins. Co. v. Mechanics' Fire Ins. Co.*, 7 Wend. 31. It has been said that the stockholders constitute the corporation. It may

be so, to the extent to which they have the power to act, and this is only in the choice of directors, and no more. Beyond this, they can only be considered as the persons for whose ultimate individual interests a corporation acts. The directors derive all their power and authority from the charter and laws, and none from the stockholders.

"But the fear is expressed that by thus considering and treating the character and acts of the directors of a bank or other corporations, the stockholders are subject to loss, without fault of their own. This may to some extent be true; but the protection of the law in this matter is not to be confined to stockholders; the public and strangers have rights also. The stockholders are volunteers, and they have consented to assume the risk of the faithful or unfaithful management of the corporation. If, in this case, one of two innocent persons or classes are to suffer, which should it be—that one which is brought in to suffer loss without its consent or power to prevent it, or the one which has created the power and selected the persons to enforce it?

"But after all, the objection to the remedy of this plaintiff against the bank, in its corporate capacity, is not so much that, as a corporation it can not be made responsible for torts committed by its directors, as that it can not be subjected for that species of tort which essentially consists in motive and intention. The claim is, that as a corporation is ideal only, it can not act from malice, and therefore commence and prosecute a malicious or vexatious suit. This syllogism of reasoning might have been very satisfactory to the school men of former days; more so, we think, than to the jurists who seek to discover a reasonable and appropriate remedy for every wrong. To say that a corporation can not have motives, and act from motives, is to deny the evidence of our senses, when we see them thus acting and effecting thereby results of the greatest importance every day. And if they can have any motive, they can have a bad one—they can intend to do evil as well as to do good.

If the act done is a corporate one, so must the motive and intention be.  In the present case, to say that the vexatious suit, as it is called, was instituted, prosecuted, and substantially sanctioned by the bank, although the acts were those of the bank, the intention was only that of the individual directors, is a distinction too refined, we think, for practical application."

In *Reed v. Home Savings Bank*, 130 Mass. 443, it was held that a bank was subject to the same rules and liable to the same class of actions as ordinary business or trading corporations, and the fraud or malice of its agents are imputable to the corporation and render it liable where malicious intent is necessary to be proved.

The principle enunciated and applied by the supreme court of Massachusetts, in *Nims v. Mount Hermon Boys' School, a Corporation*, reported in 22 L. R. A. 364, is in harmony with our view of the law in this case.  The school corporation was organized for educational purposes, and had no power or authority to engage in any other business.  For the accommodation of some of its patrons, it set up and operated a public ferry, for hire, which acts were *ultra vires*.  Nims brought an action against the corporation for damages on account of injuries sustained by reason of the negligence of the ferryman.  The school corporation made the defense that under its charter it had no authority to operate a ferry, and that the corporation could not be bound by the unauthorized acts of its directors, or torts of its employees in that particular.  The court held the corporation liable on the ground that the corporation had accepted the receipts from the ferry traffic, and had knowledge through its officers of the unauthorized acts, and by its action had ratified the same, and kept the money.  And the rule is adopted that a corporation can not escape liability on ac-

count of the torts of their agents upon the ground of *ultra vires.*

This same doctrine is upheld by the supreme court of the United States in *Salt Lake City v. Hollister*, 118 U. S. 256, Mr. Justice Miller delivering the opinion. The city of Salt Lake had set up a distillery and for some time had been engaged in the business of distilling and producing spirits. Hollister, as collector of internal revenue, collected from the city the sum of $12,057.75, as revenue on the spirits distilled. The city sued to recover this fund as being illegally exacted from the city treasury.

It was contended on behalf of the city that, under its corporate powers, it was unauthorized to engage in the distilling business, and the acts of its officers were *ultra vires*, and that the clty was not liable for the tax upon the spirits so unlawfully manufactured by its officers and agents. The supreme court held the city liable for the tax, and the learned justice said:

"But while the city does not deny the actual fact of distillation, and of fraudulent returns by it, it denies the whole affair by argument. It says that, though it is very true the city did distil spirits, did sell them, and did receive the money into its treasury, it can not be held liable for this because it had no legal power to do so. Its want of corporate authority to engage in distilling is to be received as conclusive evidence that it did not do so, while by the pleading it is admitted that it did. Because there was no statute which authorized it as a city of Utah to distil spirits, it could engage in this profitable business to any extent, without paying the taxes which the laws of the United States require of every one else who did the same thing.

"If the Territory of Utah had added to its other corporate powers that of making and selling distilled spirits, then the city would be liable to the tax, but, because it

had no such power by law, it could do it without any liability for the tax to the United States or to any one else.

"It would be a fine thing, if this argument is good, for all distillers to organize into milling corporations to make flour, and proceed to the more profitable business of distilling spirits, which would be unauthorized by their charters or articles of incorporation; for they would thus escape taxation and ruin all competitors.

"It is said that the acts done are not the acts of the city, but of its officers or agents who undertook to do them in its name. This would be a pleasant farce to be enacted by irresponsible parties, who give no bond, who have no property to respond to civil or criminal suits, who make no profit out of it, while the city grows rich in the performance. It is to be taken as a fair inference on this demurrer that all that the city might have done was done in establishing this business. The officers who, it is said, did this thing, must be supposed to have been properly appointed or elected. Resolutions or ordinances of the governing body of the city directing the establishing of the distillery and furnishing money to buy the plant, must be supposed to have been passed in the usual mode. Everything must have been done under the same rules and by the same men as if it were a hospital or a town hall. If the demurrer had not admitted this, it could no doubt have been proved on an issue denying it.

"But the argument is unsound that whatever is done by a corporation in excess of the corporate powers, as defined by its character, is as though it was not done at all. A railroad company authorized to acquire a right of way by such exercise of the right of eminent domain as the law prescribes, which undertakes to and does seize upon and invade, by its officers and servants, the land of a citizen, makes no compensation, and takes no steps for the appropriation of it, is a naked trespasser, and can be made responsible for the tort. It had no authority to take the man's land or to invade his premises. But if the governing board had directed the act, the corporation could be sued for the tort, in an action of ejectment, or in

trespass, or on an implied assumpsit for the value of the land. A plea of *ultra vires*, in this case, would be no defense.

"The truth is, that, with the great increase in corporations in very recent times, and in their extension to nearly all the business transactions of life, it has been found necessary to hold them responsible for acts not strictly within their corporate powers, but done in their corporate name, and by corporation officers who were competent to exercise all the corporate powers. When such acts are not founded on contract, but are arbitrary exercises of power in the nature of torts, or are *quasi*-criminal, the corporation may be held to a pecuniary responsibility for them to the party injured."

The foregoing observations are peculiarly applicable to the case under consideration. The bank took and accepted the mortgage according to DeSteiguer's fraudulent agreement with Melone. It took possession of the goods that Melone had procured under their dishonest scheme agreed to by its president. It sold the goods that had been procured pursuant to the fraudulent design. It accepted the proceeds of the sale as the fruits of the fraud, and now seeks to escape liability upon the ground that its president was acting without his lawfully constituted authority. Courts cannot lend themselves to aid corporations in holding on to money received in such a manner, and under such circumstances. When the bank accepted the results of DeSteiguer's fraudulent schemes, it became equally liable with him and jointly liable for his acts, and under the facts alleged, plaintiffs are entitled to recover the value of their goods from any and all of the tort-feasors.

It is contended by counsel for defendant that the goods belonged to Melone Brothers, and they had a right to take the mortgage as security, and to sell the same for

the payment of their claim. This contention is based upon a false assumption. The title to the goods, under the facts alleged in the complaint, which are confessed by the demurrer, never passed to Melone Brothers, and they could convey none by the mortgage to the bank, for it had notice through its manager of all the facts constituting the fraud, and their seizure of the goods amounted to a conversion for which they are liable to the owners.

It may be urged that the stockholders of the corporation ought not to be held to a loss on account of the unauthorized acts of DeSteiguer. But the answer to this is, they placed him in this position; they intrusted their interests to his management and keeping, and if in carrying on their business he perpetrated a fraud upon innocent persons, they who made it possible for him to perpetrate the fraud must suffer, rather than those who are in no wise responsible for his actions.

The judgment of the district court is reversed with direction to overrule the defendant's demurrer to the complaint, and for further proceedings.

Dale, C. J., having presided in the court below, and Bierer, J., having been of counsel, not sitting; all the other Justices concurring.